## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JENNIFER ANN GALVAN,

      Petitioner,                         CASE NO. 2:15-CV-10882
                                          HONORABLE SEAN F. COX
v.                                      UNITED STATES DISTRICT JUDGE

ANTHONY STEWART,

      Respondent,

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, GRANTING IN PART AND DENYING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING PETITIONER LEAVE TO APPEAL *IN FORMA PAUPERIS*

Jennifer Ann Galvan, ("petitioner"), incarcerated at the Huron Valley Women's Correctional Facility in Ypsilanti, Michigan, filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which she challenges her convictions for first-degree felony murder, Mich. Comp. Laws, § 750.316(1)(b); torture, Mich. Comp. Laws, § 750.85; and first-degree child abuse, Mich. Comp. Laws, § 750.136b(2). For the reasons stated below, the petition for writ of habeas corpus is **DENIED WITH PREJUDICE.**

### I.  Background

Petitioner was convicted following a jury trial in the St. Clair County Circuit Court, in which she was jointly tried with her husband and co-defendant Joe Galvan. This Court recites verbatim the relevant facts regarding petitioner's conviction from the Michigan Court of Appeals' opinion affirming her conviction, which are presumed correct on habeas review

1

pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

## I. FACTS

Prhaze Galvan died on January 15, 2010. The medical examiner, Daniel Spitz, M.D., concluded that the death was a homicide and that she died of "multiple blunt force head injuries." More specifically, Dr. Spitz concluded that she died of "impact involving the right side of the head," which resulted in "injury to the brain, bleeding over the surface of the brain, and then the reaction of the brain to that bleeding which is brain swelling." Dr. Spitz noted that Prhaze had injuries and bruising all over her body in various stages of healing. The injuries included pattern injuries, several of which were caused by "a white plastic spatula type spoon with a fairly long handle." Dr. Spitz estimated that there were 20 or more injuries to her head and neck. Defendants initially reported that Prhaze had fallen in the bathroom and hit her head. However, Dr. Spitz and a pediatric expert both concluded that the bathtub injury story "didn't fit" and could not account for the type of trauma that existed.

Other evidence indicated that the abuse had been unrelenting. Defendant Jennifer Galvan's sister, Kathleen LaFave, had on one occasion seen Prhaze with two black eyes, on another with one black eye, and on still another saw her with a bruise that covered her whole butt cheek. On another occasion she discovered Prhaze in the shower in her clothes; defendant Jennifer Galvan explained that she had wet her pants. Another sister witnessed a scabbed chin with a mark by her eye, a bruise on her lower back and blackened eyes. John Mugnano, a longtime friend of defendant Jennifer Galvan who sometimes watched Prhaze, said that "[a]nytime that I ever had her her left eye was black or her right eye was black." Further, he once observed Prhaze standing with her nose to the wall for 30 to 40 minutes. Mugnano testified that defendant Jennifer Galvan dropped Prhaze off at his home and asked for masking tape. After Jennifer left his home, he called out to Prhaze, but she did not answer. He found Prhaze with her mouth, arms, and knees taped together. He later made an anonymous report to Child Protective Services because he did not see the couple's treatment of Prhaze improving.

Defendant Jennifer Galvan's mother twice saw Prhaze with black eyes; Jennifer explained that on one occasion she fell in the tub. She also noted a bruise on Prhaze's hip and one on her butt. A babysitter, noted "[b]lack eyes, like horrible bruises like on her head," including "a tennis ball swelling out of her head," and bruising "[o]n her butt. Bruises everywhere," including her arms, legs, thighs and back. On one occasion, Prhaze explained the presence

2

of a bruise by saying she had been spanked with a spoon when she tried to get out of a cold shower. When family members questioned defendant Jennifer Galvan about the condition of the child, she claimed that the child was clumsy and received bruises from playing with the family puppy. Other family members never saw Prhaze after they complained about the child's condition.

There was also evidence that Prhaze was not being fed. She weighed 32 pounds 14 months before her death and 32 pounds at the time of death. Indeed, family members testified that Prhaze frequently woke up at night and would search the home, even the garbage can for food. As a result, defendant Jennifer Galvan would withhold meals from the child as a punishment. The couple would force their children to face a wall as a form of punishment. Witnesses testified that Prhaze was consistently on punishment and for extended periods of time. There was also testimony that defendant Jennifer Galvan's biological children were not dressed or treated the same as Prhaze. Also, witnesses observed Prhaze transform during the course of the ongoing abuse from a happy child to a child who was withdrawn, non-interactive, not playful, and "emotionless."

Defendant Jennifer Galvan was a licensed practical nurse. Her co-workers testified that Jennifer hated Prhaze, referred to the child as the devil, blamed Prhaze for the death of the couple's infant son, and claimed that the child was ruining her marriage. Defendant Jennifer Galvan testified in her own defense and denied the claims raised by family, friends, and coworkers. She asserted that she loved Prhaze and claimed that the witnesses were mistaken or misconstrued her statements. She denied ever calling Prhaze the devil, but rather mentioned that the child would dress as the devil for Halloween. Additionally, she denied withholding meals from the child as a form of punishment or that the duration of time standing at the wall was ever excessive. She also denied ever tying or restraining the child. However, when confronted with a text that she sent to defendant Joe Galvan wherein she purportedly referred to Prhaze as an expletive brat who could walk while tied up, she could not recall what the text meant. Rather, defendant Jennifer Galvan questioned the conduct of babysitters and family members, claiming that one family member left Prhaze on the porch at night. Defendant Joe Galvan did not testify, but his history of abuse with Prhaze's half-brother and others was presented during trial, and his admission to hitting Prhaze with a belt to defendant Jennifer Galvan's co-worker was admitted at trial.

**************************************************************

Dr. Spitz's testimony was competent to establish that someone abused this

child causing her death. Moreover, there was evidence giving rise to a reasonable suspicion that defendant Jennifer Galvan encouraged the fatal blow. Accepting for purposes of discussion the version of events that defendants gave to police, Prhaze was injured when she was told to get in the shower after wetting her pants, and defendant Jennifer Galvan was present at this point. There was evidence that Prhaze was punished with cold showers, while clothed, for wetting her pants. Furthermore, defendant Joe Galvan had previously beat her with a belt resulting in welts on her bottom, and the child had injuries in various stages of healing indicative of acute and chronic child abuse. There was testimony that defendant Jennifer Galvan hated Prhaze, withheld meals from the child, forced the child to put her nose against the wall for long periods, forced the child to take cold showers, and bound the child's hands, knees, and mouth with masking tape. There was also evidence that someone had spanked her with a spoon for trying to get out of a cold shower, and that she was repeatedly seen with bruising, including many black eyes. This evidence, coupled with defendant Jennifer Galvan's inferred presence in the home at the time the fatal injury was sustained, was sufficient to create an inference that she was complicit with respect to the "discipline" that led to the fatal injury.

*************************************************************

Presuming defendant Joe Galvan inflicted the fatal injuries, defendant Jennifer Galvan's history of abuse and/or encouragement and tolerance of abuse, coupled with knowledge that defendant Joe Galvan was going to "discipline" the child for wetting her pants in a manner consistent with the past, gave rise to an inference that she had knowledge he intended to abuse or torture Prhaze. A natural and probable consequence of the abuse and torture was that defendant Joe Galvan might escalate the assault into a murder. Thus, there was sufficient evidence for the bindover.

*************************************************************

Consistent with the preliminary examination testimony, Dr. Spitz testified that the injury was probably within minutes to an hour but could have occurred up to eight hours earlier and that Prhaze would have been symptomatic during this time. The first responder noted that her eyes were "open, extremely dilated, nonmoving," that her color was monotone or gray, which is a sign of shock and "a late sign in the body" and "it takes a while to get to that point," and that it "definitely indicates she was down for awhile." The EMT who greeted her at the ambulance did not believe she was alive at first because she was pale, limp, not moving, and had dilated and non-reactive pupils. Also, her sclera was drying. The EMT indicated that the sclera is usually wet in a patient who

4

has just died but will be dry in a patient who has been dead for hours or longer. Defendant Jennifer Galvan indicated to an investigator that she had been home that morning, stating that she had left out toast and jam for Prhaze for breakfast although she did not know if Prhaze ate it. Moreover, she reported to the same investigator that she was getting ready to pick her kids up from school when she heard defendant Joe Galvan screaming and "came back" inside, suggesting she had been home immediately beforehand.

*People v. Galvan*, No. 299814, 2013 WL 5338520, at * 1-2, 4-5, 11 (Mich. Ct. App. Sept. 24, 2013).

A majority of the Michigan Court of Appeals affirmed petitioner's conviction on appeal. *Id..* Judge Douglas Shapiro dissented in part from the ruling, arguing that there was insufficient evidence to sustain petitioner's conviction for first-degree felony murder. *Id.* at * 15-18.

The Michigan Supreme Court denied petitioner leave to appeal. *People v. Galvan,* 495 Mich. 963, 843 N.W.2d 749 (2014).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. The trial court violated the Sixth Amendment right to an impartial jury and both Fifth and Fourteenth Amendment rights to due process when it denied the motion for a change of venue.

II. The trial court violated both Fifth and Fourteenth Amendment rights to due process when it reversed the district court's decision refusing to bind Galvan over on the charge of first degree murder.

III. The trial court violated the Sixth Amendment right to a fair trial and both Fifth and Fourteenth Amendment rights to due process.

IV. There was insufficient evidence to support her convictions of felony

murder, torture, and child abuse. [1]

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim–
>
>> (1)    resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal
>> law, as determined by the Supreme Court of the United
>> States; or
>> (2)    resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the
>> evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question

of law or if the state court decides a case differently than the Supreme Court has on a set of

materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An

"unreasonable application" occurs when "a state court decision unreasonably applies the law

of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court

may not "issue the writ simply because that court concludes in its independent judgment that

the relevant state-court decision applied clearly established federal law erroneously or

---

[1]  Respondent in her answer indicates that petitioner may have attempted to raise ineffective assistance of appellate and trial counsel claims in her motion to stay the proceedings and to expand the record.  In her reply brief, petitioner indicates that she does not wish to raise any ineffective assistance of counsel claims. *See* Reply Brief, p. 3. Accordingly, the Court will not address such claims in its opinion.

6

incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

7

## IV.  Discussion

### A.  Claim # 1.  The pretrial publicity claim.

Petitioner alleges that the trial judge should have granted her motion to change venue because of extensive pretrial publicity.  The Michigan Court of Appeals rejected petitioner's claim:

> The jury selection in this case took two days.  During that time, the court on its own initiative excused every prospective juror who said he or she had heard something about the case and might be influenced by that prior knowledge.  The court also excused on its own initiative every prospective juror who indicated that the nature of the proceedings might be problematic. Defendants passed for cause on every juror actually seated.  On this record, there is no reason to question the jurors' representations that they would not be influenced by any articles about the homicide.  Moreover, there has been no showing or suggestion that the articles were anything other than factual. If defendants found no basis for challenging any individual juror for cause, it does not follow that there was actual prejudice resulting from pretrial publicity or that they were deprived of a fair and impartial trial due to local prejudice.  Thus, the trial court did not abuse its discretion in denying the motion for a change of venue.

*People v. Galvan*, 2013 WL 5338520, at * 7 (internal citation omitted).

There are two types of prejudice which can arise in cases where jurors are exposed to pretrial publicity.  Prejudice to a defendant can be presumed in cases where the influence of the news media, either in the community at large, or in the courtroom itself, "pervaded the proceedings." *Murphy v. Florida*, 421 U.S. 794, 798-799(1975)(internal citations omitted).  However, pretrial publicity, even pervasive adverse publicity, does not inevitably lead to an unfair trial. *See De Lisle v. Rivers*, 161 F. 3d 370, 382 (6th Cir. 1998).  The "indicia of impartiality" on the part of a jury is disregarded only in those cases "where the

8

general atmosphere in the community or the courtroom is sufficiently inflammatory." *Id.* at 382 (quoting *Murphy,* 421 U.S. at 802). The mere prior knowledge of the existence of a case, or familiarity with the issues involved, or even some pre-existing opinion as to the merits of the case, does not in and of itself raise a presumption of a jury taint. *De Lisle,* 161 F. 3d at 382. A person is not automatically rendered unqualified to serve as a juror merely because he or she has been exposed to media coverage of the charged offense. Instead, the issue becomes whether the exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented. *Dell v. Straub,* 194 F. Supp. 2d 629, 654 (E.D. Mich. 2002).

In the present case, petitioner has presented no evidence which showed the type of extensive or inflammatory pretrial publicity that has been condemned by the U.S. Supreme Court. The U.S. Supreme Court has emphasized the negative effect of pretrial publicity when the publicity amounts to an "out-of-court campaign to convict," reflecting "inflamed public sentiment." *De Lisle*, 161 F. 3d at 385 (quoting *Shepherd v. Florida*, 341 U.S. 50, 52-53 (1951)). However, coverage that consists of "straight news stories rather than invidious articles which tend to arouse ill will and vindictiveness" are not so troubling. *Id.* at 385 (quoting *Beck v. Washington*, 369 U.S. 541, 556 (1962)). The Court has reviewed the titles of the newspaper articles that petitioner has attached to her petition and finds that they are not so numerous or inflammatory so as to render petitioner's trial unfair, particularly where the vast majority of the stories appear to have simply provided "bare-bones facts" about petitioner's case. *See Deel v. Jago,* 967 F. 2d 1079, 1087-88 (6th Cir. 1992).

9

In addition, there is nothing from the record or the habeas petition to indicate that the courthouse in petitioner's trial was "conducted in a circus atmosphere, due in large part to the intrusion of the press." *Murphy*, 421 U.S. at 799 (quoting *Estes v. Texas*, 381 U.S. 532(1965)).   Petitioner has presented no evidence to demonstrate that the general atmosphere in the community or courtroom was "sufficiently inflammatory" for either the Michigan courts or this Court to disregard the jury's "indicia of impartiality." *Murphy*, 421 U.S. at 802.  In this case, there are no allegations made by petitioner that her trial took place under the conditions of "total chaos" that prevailed in cases like *Estes* or *Sheppard.* [2]  A review of those cases leaves no doubt that it was "that chaos which drove those decisions." *DeLisle*, 161 F. 3d at 384 (citing to *Murphy v. Florida,* 421 U.S. at 799).  Because the record does not indicate that petitioner's trial took part in a "circuslike atmosphere," the Court cannot presume prejudice to petitioner's case merely because the jurors were exposed to pretrial publicity about her case. *Dell,* 194 F. Supp. 2d at 655.

Petitioner has also failed to show actual prejudice to her case from the jurors' exposure to the pretrial publicity.  To demonstrate actual prejudice, a habeas petitioner must show that one or more jurors entertained an opinion before trial that petitioner was guilty and that these jurors could not put this prejudice aside and render a verdict based solely upon the evidence. *Dell,* 194 F. Supp. 2d at 655.  The test for whether pretrial publicity necessitates a change in venue is whether a juror exposed to pretrial publicity can lay aside

---

[2] *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

10

his or her impression or opinion and render a verdict based upon the evidence presented in court. *Id.*

The mere fact that a large number that a large number of the potential jurors were excused because they indicated that they could not be fair and impartial is insufficient to establish that the jurors who were ultimately seated were partial or biased. *See Murphy,* 421 U.S. at 803 (fact that 20 of 78 prospective jurors were excused because they indicated an opinion as to the defendant's guilt did not conclusively suggest a community with a sentiment so poisoned against defendant as to impeach the indifference of jurors who displayed no animus of their own). Every prospective juror who had formed an opinion about petitioner from exposure to the pretrial publicity was removed from the jury by the judge. In light of the fact that every potential juror who had formed an opinion regarding petitioner's guilt was removed from the jury, petitioner is unable to show that she was prejudiced by the pretrial publicity. *See White v. Mitchell*, 431 F.3d 517, 532 (6th Cir. 2005).

In this case, there is nothing from the record to show that any pretrial publicity tainted the jury pool where none of the jurors that served on petitioner's jury indicated that they had formed an opinion about petitioner's guilt or innocence from the stories that they had read or heard about either from the media or from persons in the community. A prospective juror's exposure to pretrial publicity does not merit his or her disqualification, where the juror states unequivocally that he would decide the case on the facts brought out at trial. *McQueen v. Scroggy*, 99 F. 3d 1302, 1319 (6th Cir. 1996). Petitioner has failed to

11

establish actual prejudice on the part of these jurors in light of the fact that all of the jurors seated indicated that they had not formed an opinion about the case from their pretrial exposure to stories about the case and would base their judgment solely upon the evidence introduced in the trial court. *Dell,* 194 F. Supp. 2d at 656.   Petitioner is not entitled to habeas relief because she failed to provide clear and convincing evidence that the jurors empaneled could not be impartial. *Bell v. Hurley*, 97 F. App'x 11, 19 (6th Cir. 2004). Petitioner is not entitled to habeas relief on her first claim.

### B.  Claim # 2.  The bindover claim.

Petitioner next claims that the circuit court erred in reversing the district court's determination at the preliminary examination not to bind her over on a charge of open murder. [3]

Petitioner has failed to state a claim upon which habeas relief can be granted.  A prior judicial hearing is not a prerequisite to prosecution by information. *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975).  There is no federal constitutional right to a preliminary examination. *United States v. Mulligan*, 520 F. 2d 1327, 1329 (6th Cir. 1975); *Dillard v. Bomar*, 342 F. 2d 789, 790 (6th Cir. 1965).  Petitioner's claim that there was insufficient evidence presented at her preliminary examination to bind her over for trial on a murder charge thus raises only a matter of state law and procedure that cannot form a basis for federal habeas

---

[3]  Under Michigan law, it is proper to charge a defendant with the crime of open murder. Such a charge gives a circuit court jurisdiction to try a defendant on first and second degree murder charges.  *See Taylor v. Withrow*, 288 F.3d 846, 849 (6th Cir. 2002).

relief. *See Tegeler v. Renico,* 253 Fed. Appx. 521, 525-26 (6th Cir. 2007). In addition, a guilty verdict renders harmless any error in the charging decision. *See United States v. Mechanik,* 475 U.S. 66, 73 (1986). Any insufficiency of evidence at petitioner's preliminary examination on the first-degree murder charge would be harmless error in light of petitioner's subsequent conviction. *See Redmond v. Worthinton,* 878 F. Supp. 2d 822, 844 (E.D. Mich. 2012). Petitioner is not entitled to relief on her second claim.

### C. Claim # 3. The right to present a defense claims.

As part of her third claim, petitioner claims that the trial court denied her the right to present a defense.

Petitioner first claims that the trial judge denied her the right to present a defense when he refused to permit her trial counsel to withdraw from representing her so that he could testify about a conversation that counsel had with the co-defendant and his attorney prior to trial, in which the co-defendant allegedly told counsel that he whipped Prhaze in the bathtub and she curled up and hit her head, at which point he hit her one more time. In the alternative, petitioner argues that the trial judge erred in denying her motion for severance, because she claims that the co-defendant's statements would have been admissible at a separate trial. The judge denied counsel's motion to withdraw, on the ground that the co-defendant's statements were inadmissible because they were made pursuant to the attorney-client privilege. The Michigan Court of Appeals affirmed the exclusion of the co-defendant's alleged confession, on the alternate ground that the co-defendant's out-of-court statement was hearsay and did not fit within any exception to the hearsay rule. *People v.*

13

*Galvan*, 2013 WL 5338520, at * 6.

Petitioner further alleges that her right to present a defense was violated when the judge refused to allow her to testify that the co-defendant told her at the hospital that he thought he was going to jail.  The Michigan Court of Appeals upheld the exclusion of this evidence on the ground that it was hearsay. *People v. Galvan*, 2013 WL 5338520, at * 15.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense.  This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986)("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'")(internal citations omitted).  However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).  The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689.  The Supreme Court gives trial court judges "wide latitude" to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).  Finally, rules that exclude evidence from criminal trials do not violate the

14

right to present a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998)(quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

In the present case, the trial judge prevented petitioner's counsel and petitioner from testifying about their conversations with the co-defendant because the defense was seeking to introduce hearsay testimony. The fundamental right to present a defense is not absolute; thus, evidence that is deemed insufficiently unreliable, such as hearsay evidence, is excludable even if it may be relevant to the defense. *See McCullough v. Stegall,* 17 F. App'x 292, 295 (6th Cir. 2001); *see also Allen v. Hawley,* 74 F. App'x 457, 462-63 (6th Cir. 2003). The exclusion of Joe Galvan's out-of-court statements, on the grounds that they were inadmissible hearsay, did not deny petitioner her right to present a defense.

Moreover, the exclusion of the co-defendant's hearsay statements to counsel and to petitioner did not deprive petitioner of her right to present a defense, because they did not refute the state's theory that petitioner was guilty because she aided and abetted in the abuse and death of her daughter, nor did either statement exculpate petitioner of her involvement in the crime. *See West v. Bell,* 550 F.3d 542, 559-60 (6th Cir. 2008). Petitioner is not entitled to relief on this claim.

### D.  Claim # 3.  The severance claim.

As part of her third claim, petitioner also argues that the trial judge erred in refusing to grant her motion for severance. Petitioner argues that the judge should have granted the motion for severance because it was prejudicial for her to be tried together with her husband.

15

A criminal defendant is not entitled to a separate trial merely because he or she might have had a better chance for acquittal in a separate trial, *Zafiro v. United States*, 506 U.S. 534, 540 (1993), nor does a criminal defendant have a right to a separate trial merely because the defendant and the co-defendant present antagonistic defenses. *Stanford v. Parker,* 266 F. 3d 442, 458 (6th Cir. 2001). The Supreme Court, in fact, has indicated that "[M]utually antagonistic defenses are not prejudicial *per se.*" *Zafiro v. United States,* 506 U.S. at 538. A court should grant severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. A habeas petitioner who seeks habeas relief on the basis of a state trial court's failure to sever his or her trial from his or her co-defendant's trial bears a very heavy burden. *Stanford,* 266 F. 3d at 459. Joinder of defendants for trial is the preferred course, which creates a presumption in favor of joinder which must be overcome by the party seeking severance. *See Foster v. Withrow,* 159 F. Supp. 2d 629, 641 (E.D. Mich. 2001).

Petitioner is not entitled to habeas relief on his claim because she failed to show that she and her co-defendant had mutually antagonistic defenses. There has been no showing that the co-defendant's defense was predicated solely on petitioner's guilt. Antagonistic defenses occur "when one person's claim of innocence is predicated solely on the guilt of a co-defendant." *United States v. Harris,* 9 F. 3d 493, 501 (6th Cir. 1993). Because petitioner has failed to show that the co-defendant's defense was irreconcilably antagonistic to her own, petitioner is not entitled to relief on this portion of her claim.

16

### E.  Claim # 3.  The 404(b) evidence claim.

Petitioner next claims that the trial court erred in allowing evidence concerning petitioner's history of past abuses of the victim and petitioner's hatred for her.  Petitioner claims this evidence was admitted for the sole purpose of showing that she had bad character.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.*  Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F. 3d 542, 552 (6th Cir. 2000).

Petitioner's claim that the state court violated M.R.E. 404(b) by admitting this evidence is non-cognizable on habeas review. *Bey v. Bagley,* 500 F 3d 514, 519 (6th Cir. 2007); *Estelle,* 502 U.S. at 72 (Supreme Court's habeas powers did not permit Court to reverse state court conviction based on their belief that the state trial judge erred in ruling that prior injury evidence was admissible as bad acts evidence under California law); *Dowling v. U.S.*, 493 U.S. 342, 352-53 (1990)(admission at defendant's bank robbery trial of "similar acts" evidence that he had subsequently been involved in a house burglary for which he had been acquitted did not violate due process).  The admission of this "prior bad acts" or "other acts" evidence against petitioner at her state trial does not entitle her to

17

habeas relief, because there is no clearly established Supreme Court law which holds that a state violates a habeas petitioner's due process rights by admitting propensity evidence in the form of "prior bad acts" evidence. *See Bugh v. Mitchell,* 329 F. 3d 496, 512 (6th Cir. 2003).

Moreover, it is not clear that the evidence that petitioner complains about would be excluded under 404(b). Background evidence, often referred to as *res gestae,* does not implicate the provisions of 404(b). *United States v. Hardy,* 228 F. 3d 745, 748 (6th Cir. 2000). Background evidence consists of other acts which are "inextricably intertwined" with the charged offenses or those acts, "the telling of which is necessary to complete the story of the charged offense." *Id.* The Sixth Circuit explained that:

> "Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense."

*United States v. Hardy,* 228 F. 3d at 748.

As the Michigan Court of Appeals noted in rejecting petitioner's claim, much of the "systemic torture and abuse or aiding and abetting the same" was relevant to prove petitioner's guilt for the crimes because this evidence demonstrated "ongoing abuse and torture and/or a mindset that encouraged the same, and it belied any notion that defendant Joe Galvan's actions were devoid of encouragement by defendant Jennifer Galvan." *People v. Galvan*, 2013 WL 5338520, at * 14. Petitioner is not entitled to relief on this claim.

**F. Claim # 4. The sufficiency of evidence claim.**

18

Petitioner contends that there was insufficient evidence to convict her of the offenses.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19(internal citation and footnote omitted)(emphasis in the original). Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. *Johnson v. Coyle,* 200 F. 3d 987, 992 (6th Cir. 2000)(internal quotations omitted).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will

sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* In fact, the *Jackson* standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis v. Lafler*, 658 F. 3d 525, 534 (6th Cir. 2011)(quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)(internal quotation marks omitted)). Therefore, for a federal habeas court reviewing the sufficiency of evidence for a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

Petitioner contends that there was insufficient evidence to convict her of first-degree felony murder on an aiding and abetting theory, because there was no evidence that she was present when the co-defendant struck the fatal blow that killed the victim nor did she give the co-defendant any assistance or encouragement to hit the victim. The Michigan Court of Appeals rejected petitioner's claim:

There was sufficient evidence that she [petitioner] was present. Consistent with the preliminary examination testimony, Dr. Spitz testified that the injury was probably within minutes to an hour but could have occurred up to eight hours earlier and that Prhaze would have been symptomatic during this time. The first responder noted that her eyes were "open, extremely dilated, nonmoving," that her color was monotone or gray, which is a sign of shock and "a late sign in the body" and "it takes a while to get to that point," and that it "definitely indicates she was down for awhile." The EMT who greeted her [the victim] at the ambulance did not believe she was alive at first because she was pale, limp, not moving, and had dilated and non-reactive pupils. Also, her sclera was drying. The EMT indicated that the sclera is usually wet in a patient who has just died but will be dry in a patient who has been dead for hours or longer. Defendant Jennifer Galvan indicated to an investigator that she had been home that morning, stating that she had left out toast and jam for Prhaze for breakfast although she did not know if Prhaze ate it. Moreover, she reported to the same investigator that she was getting ready to pick her kids up from school when she heard defendant Joe Galvan screaming and "came back" inside, suggesting she had been home immediately beforehand. Given her own indication that she had been there on the morning in question, coupled with evidence that the injury occurred well before responders arrived, there was sufficient evidence to give rise to an inference that she was present at the time of the injury. Irrespective of her statement regarding her location at the time of the fatal injury, the credibility of that assertion presented an issue for the trier of fact.

Moreover, even if she did not inflict the fatal blow, given the extensive evidence of ongoing abuse in the household and her mistreatment of the child, coupled with her disdain for the child, an inference arises that she was complicit in the abuse, a natural consequence of which would be death. "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." There was sufficient evidence to convict defendant Jennifer Galvan of felony murder based on an aiding and abetting theory.

*People v. Galvan*, 2013 WL 5338520, at *11 (internal citations omitted).

The Michigan Court of Appeals further concluded that there was sufficient evidence

to convict petitioner of aiding and abetting in the child abuse and torture charges:

Defendant Jennifer Galvan asserts that disdain for Prhaze was not enough to

show that she abused and/or tortured Prhaze and/or that she aided and abetted same, and notes that first-degree child abuse requires an intent to harm. The evidence established more than disdain. As noted above, it established that defendant Jennifer Galvan aided and abetted the abuse that led to Prhaze's death. Because subdural hemorrhage or hematoma is a serious physical harm for purposes of first-degree child abuse and an internal injury for purposes of torture, the evidence was sufficient on this basis.

*People v. Galvan*, 2013 WL 5338520, at * 12.

Under Michigan law, the elements of first-degree felony murder are:

(1) the killing of a human being;
(2) with an intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm is the probable result (i.e., malice);
(3) while committing, attempting to commit, or assisting in the commission of one of the felonies enumerated in the felony murder statute.

*Matthews v. Abramajtys,* 319 F.3d 780, 789 (6th Cir. 2003)(citing *People v. Carines*, 460 Mich. 750, 759; 597 N.W. 2d 130 (1999)).

The Michigan Supreme Court has indicated that: "[A] jury can properly infer malice from evidence that a defendant set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 409 Mich. 672, 729; 299 N.W.2d 304 (1980); *see also Carines,* 460 Mich. at 759 (internal citation omitted).

A person is guilty of first-degree child abuse if he or she knowingly or intentionally causes serious physical or mental harm to a child. *See People v. Maynor,* 470 Mich. 289, 295; 683 N.W. 2d 565 (2004)(citing Mich. Comp. Laws, § 750.136b(2)). Physical harm is defined under Michigan's child abuse statute as "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain

22

damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." Mich. Comp. Laws, § 750.136b(1)(f).       Under Mich. Comp. Laws, § 750.85, a person is guilty of torture if the person "with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control."

To support a finding under Michigan law that a defendant aided and abetted in the commission of a crime, the prosecutor must show that:

> 1. the crime charged was committed by the defendant or some other person;
> 2. the defendant performed acts or gave encouragement that assisted the commission of the crime; and
> 3. the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.

*Riley v. Berghuis,* 481 F.3d 315, 322 (6th Cir. 2007)(citing *Carines*, 460 Mich. at 757-58).

Under Michigan law, to convict a defendant of felony murder under an aiding and abetting theory, the prosecutor must show that someone killed the victim during the underlying predicate felony, that the defendant assisted that person in killing the victim, and that the defendant either intended to commit the crime or he knew when he gave the assistance that the other person intended to commit the crime. *See Meade v. Lavigne,* 265 F. Supp. 2d 849, 858 (E.D. Mich. 2003)(citing *People v. Smielewski*, 235 Mich. App. 196, 207; 596 N.W. 2d 636, 642 (1999)).

In order to be guilty of aiding and abetting under Michigan law, the accused must

take some conscious action designed to make the criminal venture succeed. *See Fuller v.*
*Anderson,* 662 F. 2d 420, 424 (6th Cir. 1981). Aiding and abetting describes all forms of
assistance rendered to the perpetrator of the crime and comprehends all words or deeds
which might support, encourage, or incite the commission of the crime. *People v. Turner*,
213 Mich. App. 558, 568; 540 N. W. 2d 728 (1995). The quantum or amount of aid, advice,
encouragement, or counsel rendered, or the time of rendering, is not material if it had the
effect of inducing the commission of the crime. *People v. Lawton*; 196 Mich. App. 341, 352;
492 N. W. 2d 810 (1992). Finally, the Michigan Supreme Court has held that there is no
language in Michigan's aiding and abetting statute that shows an intent by the Michigan
Legislature "to abrogate the common-law theory that a defendant can be held criminally
liable as an accomplice if: (1) the defendant intends or is aware that the principal is going
to commit a specific criminal act; or (2) the criminal act committed by the principal is an
'incidental consequence[ ] which might reasonably be expected to result from the intended
wrong.'" *People v. Robinson,* 475 Mich. 1, 9; 715 N.W. 2d 44 (2006)(*quoting* Perkins,
Criminal Law (3d ed.), pp. 741-43, 745).

        To be convicted of aiding and abetting, the defendant must either possess the required
intent to commit the crime or have participated while knowing that the principal had the
requisite intent; such intent may be inferred from circumstantial evidence. *See Long v.*
*Stovall,* 450 F. Supp. 2d 746, 753 (E.D. Mich. 2006); *People v. Wilson*, 196 Mich. App. 604,
614; 493 N. W. 2d 471 (1992). The intent of an aider and abettor is satisfied by proof that
he knew the principal's intent when he gave aid or assistance to the principal. *People v.*

*McCray*, 210 Mich. App. 9, 14; 533 N. W. 2d 359 (1995). An aider and abettor's state of mind may be inferred from all of the facts and circumstances, including close association between the defendant and the principal, the defendant's participation in the planning and execution of the crime, and evidence of flight after the crime. *Turner,* 213 Mich. App. at 568-69.

Petitioner claims that there was no evidence that she aided and abetted the co-defendant with the fatal blow that killed the victim. Petitioner contends that she was at most merely present when the co-defendant fatally struck the victim. Petitioner further contends that there is no evidence that she aided and abetted in the child abuse and torture.

Mere presence, even with knowledge that a crime is being committed, is insufficient to establish that a defendant aided and abetted in the commission of the offense. *People v. Norris*, 236 Mich. App. 411, 419-20; 600 N. W. 2d 658 (1999); *Fuller v. Anderson*, 662 F. 2d at 424. "[H]owever, a claim of mere presence is not a 'catch-all excuse' to defeat an inference of guilt beyond a reasonable doubt. In evaluating a 'mere presence' defense, a factfinder must distinguish, based upon the totality of the circumstances, between one who is merely present at the scene and one who is present with criminal culpability." *See Long v. Stovall*, 450 F. Supp. 2d at 754 (internal citation omitted). An aider and abettor who is intentionally present during the commission of a crime may be silent during the crime's commission, "but by his demeanor, or through behavior and acts not directly related to the crime, provide 'moral support' that is recognizable to, and relied upon by, the principal. Such acts may be silent and may not be overt but may still amount to more than 'mere'

25

presence." *Sanford v. Yukins,* 288 F. 3d 855, 862 (6th Cir. 2002). Michigan's "broad definition" of aiding and abetting "easily encompasses situations where the alleged aider and abettor, although silent and not committing acts directly related to the crime, was not 'merely' present, but providing emotional encouragement and support." *Id.*

There was sufficient evidence in the present case to convict petitioner of aiding and abetting the co-defendant with respect to the first-degree murder charge and the underlying predicate felonies. There was significant evidence that the injuries which caused the victim's death happened well before the fire department and paramedics were summoned to petitioner's house. Dr. Spitz testified that the fatal blow to the head could not have come from the victim falling in the bathtub. Several witnesses testified that victim had often suffered from bruises to her buttocks, arms, legs, and back, and that she often had black eyes. Dr. Spitz and the treating physicians testified that the victim had several bruises at the time of her death in various stages of healing, which would suggest a pattern of on-going abuse. Testimony established that petitioner beat the victim with a plastic spoon, would make the victim take cold showers, and would tape her mouth shut and tie her wrists together when she would misbehave. There was substantial evidence that petitioner was depriving the victim of adequate nutrition, stunting the victim's growth. Several witnesses testified that petitioner told them she hated the victim and even wished she was dead. There was also extensive evidence that the co-defendant Joe Galvan physically abused the victim with petitioner's knowledge and encouragement.

In light of this overwhelming evidence, a rational trier of fact could conclude either

26

that petitioner herself inflicted the fatal blow which caused the victim's death or at least gave encouragement to her husband to do so as punishment for the victim wetting her pants, so as to sustain her convictions on an aiding and abetting theory. A rational trier of fact could have inferred, at a minimum, that petitioner encouraged her husband to use "his heavy handed disciplinary methods" on their child to punish her for wetting her pants, so as to sustain her convictions for first-degree felony murder, first-degree child abuse, and torture on an aiding and abetting theory. *See Mobley v. Stovall*, No. 05-CV-74707, 2007 WL 772922, at *5 (E.D. Mich. Mar. 12, 2007).

Finally, in addition to this evidence, several of the firefighters and paramedics who responded to the Galvan home testified that petitioner did not seem concerned about the victim or ask how she was doing while she was being treated. (Tr. 6/17/10, pp. 529-30, 554-55). When Detective Amey asked petitioner if he could look around the house, petitioner asked him if she needed an attorney. Petitioner also volunteered without prompting that the victim did not wash her hair well and was "clumsy as an ox." (Tr. 6/30/10, pp. 1804-1806). This last statement appears to be an attempt by petitioner to suggest that the victim fell in the shower, implying that petitioner was attempting to fabricate a defense for herself and/or her husband. "A defendant's 'reactions to the circumstances' of a crime may suggest involvement (or for that matter lack of involvement) with a crime." *Bell v. Jackson*, 379 F. App'x 440, 446 (6th Cir. 2010). Petitioner's lack of concern about the victim, her question to the detective about whether she needed to get an attorney, and her apparent attempt to manufacture a defense for the victim's injury all suggest involvement in the crime.

27

Finally, to the extent that petitioner challenges the credibility of the prosecution witnesses, she would not be entitled to relief.  Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence. *Martin v. Mitchell,* 280 F. 3d 594, 618 (6th Cir. 2002).  An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F. 3d 265, 286 (6th Cir. 2000).  The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Id.* Petitioner is not entitled to relief on her fourth claim.

## IV. Conclusion

The Court will deny the petition for writ of habeas corpus.

A habeas petitioner must receive a certificate of appealability ("COA") in order to appeal the denial of a habeas petition for relief from either a state or federal conviction. [4] 28 U.S.C. §§ 2253(c)(1)(A), (B).  A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S.

---

[4]   Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254; *See also Strayhorn v. Booker*, 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

473, 484-85 (2000).

Although the Court believes that its decision to deny habeas relief was correct, the Court will nonetheless grant petitioner a certificate of appealability on her fourth claim involving the alleged insufficiency of evidence for the following reason. Judge Shapiro of the Michigan Court of Appeals dissented from the majority opinion, arguing that there was insufficient evidence to sustain petitioner's conviction for first-degree felony murder. "When a state appellate court is divided on the merits of the constitutional question, issuance of a certificate of appealability should ordinarily be routine." *Jones v. Basinger*, 635 F. 3d 1030, 1040 (7th Cir. 2011). The fact that Judge Shapiro would have reversed petitioner's first-degree felony murder conviction based on the sufficiency of the evidence shows that jurists of reason could decide the sufficiency of evidence claim differently or that it deserves encouragement to proceed further. *See Robinson v. Stegall,* 157 F. Supp. 2d 802, 820, fn. 7 & 824 (E.D. Mich. 2001). Accordingly, the Court will grant petitioner a certificate of appealability with respect to her fourth claim.

Petitioner is not entitled to a certificate of appealability on her remaining claims, because she failed to make a substantial showing of the denial of a federal constitutional right. *See also Millender v. Adams,* 187 F. Supp. 2d 852, 880 (E.D. Mich. 2002).

Petitioner is also granted leave to proceed on appeal *in forma pauperis*, as any appeal would not be frivolous. A court may grant *in forma pauperis status* if the court finds that an appeal is being taken in good faith. *See* 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a); *Foster v. Ludwick*, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).

29

## V. CONCLUSION

Accordingly, **IT IS ORDERED** that the petition for writ of habeas corpus is

**DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** with

respect to petitioner's fourth claim [sufficiency of evidence] and **DENIED** with respect to

her remaining claims.

**IT IS FURTHER ORDERED** that petitioner is granted leave to proceed on appeal

*in forma pauperis*.


Dated:  March 21, 2016                                   S/ Sean F. Cox
                                                         Sean F. Cox
                                                         U. S. District Judge


I hereby certify that on March 21, 2016, the foregoing document was served on counsel of
record via electronic means and upon Jennifer Galvan via First Class mail at the address
below:

JENNIFER GALVAN 418953
HURON VALLEY COMPLEX - WOMENS
3201 BEMIS ROAD
YPSILANTI, MI 48197


                                                         S/ J. McCoy
                                                         Case Manager